TERRI F. LOVE, Judge.
h CHS-SLE Land, LLC (“LLC”) owns a riverfront parcel along the west bank of the Mississippi River, known as Tract E-2. South Louisiana Ethanol, LLC (“SLE”) sued CHS, Inc. (“CHS”) and the LLC, seeking dissolution of the LLC. The trial court granted CHS’ claim for declaratory relief finding CHS acquired and holds lessee rights under a 99-year lease (“1968 Lease”) pertaining to the subject property, and granted SLE’s claim for dissolution of the LLC. We find no error in the trial court’s judgment as CHS acquired lessee rights to Tract E-2 by assignment and the LLC acquired the property subject to the 1968 Lease. We also find no error in the trial court’s judgment which granted CHS’ exceptions of no cause of action for partition and no right of action for partition. Finally, we find no error in the trial court’s granting of judicial dissolution of the LLC as the evidence is sufficient to establish that it is not reasonably practicable to carry on the business of the LLC.
| .FACTUAL AND PROCEDURAL BACKGROUND
CHS is a grains and food cooperative that owns and operates a grain elevator, ship dock, barge unloader, and barge fleet in Myrtle Grove, Plaquemines Parish, Lou *86 isiana. Their facility, located along the west bank of the Mississippi River and in operation since 1994, exports grains and other agricultural products aboard deep draft ocean vessels. The main barge fleeting area is along a tract of land known as Tract E-2, which CHS claims it leases under an August 1, 1968 lease with a 99-year term. CHS also fleets its barges from an adjacent tract of land formerly owned by Entergy Corp., f/k/a the Louisiana Power and Light Company (“LP & L Property”). The lease on the LP & L Property had an indefinite term and was susceptible to termination on 90 days’ notice.
In 2006, William Hurst (“Mr. Hurst”), Kennett Stewart (“Mr. Stewart”), and John Paul (“Mr. Paul”) formed SLE to purchase property adjacent to CHS’ Myrtle Grove facility. The SLE property included a partially completed ethanol plant that SLE hoped to bring into commercial production. To actualize SLE’s plans, SLE needed a supply of grain feedstock and access to the riverfront to ship the ethanol the facility produced. In early 2007, SLE began negotiations with CHS to purchase grain for its ethanol plant, and also inquired about subleasing part of Tract E-2 for a riverfront dock. CHS agreed to sell grain to SLE; however, the parties could not reach an agreement on SLE’s plan for a dock. CHS was reluctant to sublease Tract E-2 because it was concerned it would impede CHS’ fleeting operations.
13When CHS learned SLE was in negotiations to purchase the LP & L Property and would be in a position to cancel CHS’ lease on that property with only 90 days’ notice, CHS worked out a compromise with SLE which is memorialized in the April 2007 “Mutual Fleeting Servitudes Agreement” (“MFSA”). The MFSA provided for the two parties to share use of the Mississippi River frontage. Specifically, SLE or its affiliate would purchase the LP & L Property and would make available to CHS the long-term right to fleet CHS’ barges along the property. In return, CHS would permit SLE use of a portion of Tract E-2 so that it could build a dock.
The parties also entered into a grain procurement agreement (“Procurement Agreement”) where SLE would purchase from CHS grain feedstock for its ethanol plant. CHS alleges that the MFSA and the Procurement Agreement were directly linked in that if no feedstock was purchased, the MFSA would terminate and the parties’ rights and positions would return to their original state prior to the agreement. Notably, the MFSA stated:
Whereas, CHS, as successor in interest to Mississippi Grain Elevator, Inc., leases the property [Tract E-2] pursuant to a lease dated as of August 1,1968, which represents approximately one thousand thirty-five (1035) linear feet along the Mississippi River.
Around the same time that the MFSA was executed, SLE also began negotiations with CLL Limited Partnership, Ltd. (“CLL”) to purchase Tract E-2. Pursuant to the 1968 Lease, however, CHS enjoys a right of first refusal on the property and advised CLL that it would match SLE’s offer in an effort to protect its long-term use of Tract E-2 after the 1968 Lease expires. The testimony in the Lrecord indicates that the parties wanted to avoid a bidding war, so CHS and SLE agreed to purchase Tract E-2 together.
In July 2007, CHS and SLE formed a limited liability company to buy and hold Tract E-2. The formation of the LLC was memorialized in a Letter Agreement drafted by attorney Francis J. Lobrano (“Mr. Lobrano”) for his then client SLE, addressed to CHS Vice-President Gary *87 Anderson (“Mr. Anderson”). The Letter Agreement was signed by Mr. Stewart and Mr. Anderson as representatives for SLE and CHS. The parties agreed that the LLC would purchase Tract E-2 from CLL, and CHS and SLE would be its only members, each owning a 50% interest in the company. Additionally, the Letter Agreement recognized that Tract E-2 would be used by both CHS and SLE as contemplated in the MFSA. In particular, CHS and SLE would have the right to lease from the LLC portions of Tract E-2 as specified in the MFSA.
Mr. Stewart and Mr. Lobrano, witnesses for SLE, testified at trial that the Letter Agreement was never intended to serve as the LLC’s operating agreement, and no formal operating agreement was ever executed. The trial court ruled that the LLC has no formal operating agreement and that the Letter Agreement is the only document evidencing the business purpose of the LLC.
In August of 2007, the LLC purchased Tract E-2 from CLL for $255,000.00. The Cash Sale states that Tract E-2 was purchased “subject to” and “tak[ing] cognizance of’ the 1968 Lease amongst other encumbrances. Additionally, the Cash Sale provides that the property was purchased subject to “all reservations and | ¿all servitudes, rights-of-way, alienations, encroachments and other matters, whether or not of record.... ”
Thereafter, SLE filed a permit application to build a dock on the upriver portion of Tract E-2. SLE’s manager Mr. Stewart then formed a new company with his wife, TKS Ventures, LLC (“TKS”), and in September 2007, TKS bought the LP & L Property as contemplated in the MFSA.
In October 2007, after CLL sold Tract E-2 to the LLC, CHS made attempts to pay CLL rent for the 2007-2008 period; however, CHS received a letter from CLL that it no longer owned the property. The evidence at trial indicates that after initially acquiring Tract E-2 the LLC did not set up a bank account to receive lease payments. Although CHS did not pay rent on Tract E-2 between 2007 and 2011, CHS offered testimony at trial that this was due to a “clerical oversight.” In 2011, CHS, as a manager of the LLC, opened a bank account in the LLC’s name and deposited into the account rent payments for the missing time period.
By 2008, financing fell through for SLE’s ethanol plant, and SLE filed for bankruptcy in August 2009 which resulted in a plan of liquidation in April of 2011. During the bankruptcy proceedings, SLE sought the court’s approval to sell its interest to a purchaser of SLE’s choosing, which CHS opposed and the bankruptcy court denied. The bankruptcy court concluded that if an agreement could not be reached with regard to the transfer of SLE’s interest in the LLC, SLE was ordered to institute legal proceedings to dissolve the LLC and “partition the real property | r,asset of [the LLC] to be divided in kind.” The bankruptcy court noted that “[t]his litigation may or may not be successful,” and in the event it was not,
... it is Debtor’s intention to either assign its economic attributes and retain its membership in [the LLC], or SLE will remain in existence until is able to liquidate this asset, subject to the consent and approval of security interest holder, Whitney National Bank.
Claiming the MFSA terminated as a result of SLE’s unsuccessful attempt to bring the ethanol plant to commerce, Mr. Stewart, through his company TKS, sold the LP & L Property in May 2011. In that same month, SLE filed a petition for dissolution of the LLC.
*88 In June 2011, SLE auctioned the ethanol plant site with the option to acquire the fruits of the LLC, if any, of any dissolution of the LLC. JAH, Enterprises, Inc., (“JAH”) won the bid for SLE’s assets including the fruits of the LLC’s dissolution. Notably, in October 2011, JAH assigned its rights to Plaquemines Holdings, a company in which Mr. Stewart’s company, TKS, acquired a 50% interest.
After SLE filed its petition for dissolution of the LLC, CHS filed a counterclaim asserting it was the assignee to the 1968 Lease and sought a declaratory judgment recognizing that:
(l)any transfer of any portion of [Tract E-2] is subject to the [1968] Lease; (2) that CHS has a right of first refusal that may be exercised before the transfer of any part of the property; (3) and for all other relief to which it is entitled in law and equity.
Thereafter, SLE attempted to evict CHS from Tract E-2 and call CHS into default for unpaid rent. A trial on the merits of CHS’ motion for summary judgment seeking declaratory relief was held in May 2013. In July 2013, the trial court granted CHS’ motion for partial summary judgment finding CHS is a valid lessee by assignment of the 1968 Lease. The trial court, however, granted SLE’s |7petition for dissolution of the LLC holding that it was not reasonably practicable to carry on the business of the LLC. CHS then filed a motion to amend the judgment and designate as a final judgment under La. C.C. P. art. 1915(B)(1), which the trial court granted. In a post-trial amendment to its petition, SLE requested that Tract E-2 be distributed to SLE and CHS in indivisión and as co-owners. SLE also sought the LLC’s immediate dissolution and judicial partition in kind of Tract E-2. In response, CHS filed exceptions of no cause of action and no right of action. The trial court found that SLE, as a member of the LLC, has no right to demand partition of Tract E-2 because SLE has no present ownership interest in the property. The trial court also found that SLE’s request that Tract E-2 be partitioned and distributed in kind is prohibited by law. In particular, the trial court held that SLE’s demands do not comply with the judicial guidelines for the winding up of the affairs of a limited liability company under La. R.S. 12:1336. This appeal follows.

VALIDITY OF THE LEASE

On appellate review, this Court reviews a trial court’s granting of a motion for summary judgment using the de novo standard of review. Jones v. Buck Kriehs Marine Repair, LLC., 13-0083, p. 1 (La.App. 4 Cir. 8/21/13), 122 So.3d 1181, 1183, writ denied,, 13-2260 (La.12/2/13), 126 So.3d 1285. See also Hutchinson v. Knights of Columbus, Council No. 5747, 03-1533, p. 5 n. 2 (La.2/20/04), 866 So.2d 228, 232. Given we review a motion for summary judgment de novo, we use the same standard applied by the trial court in the determining the motion for summary judgment. Id. Additionally, the appellate court will “not give deference to the trial court’s judgment or its reasons therefor ... A trial court’s reasoning for granting a summary judgment may be informative, but it is not determinative of|8the issues to be resolve by this court.” Id., 03-0083, p. 1-2, 122 So.3d at 1183; See also Cusimano v. Port Esplanade Condominium Ass’n, Inc., 10-0477, p. 4-5 (La.App. 4 Cir. 1/12/11), 55 So.3d 931, 935. If no genuine issue of material fact exists, then summary judgment is proper. La. C.C. P. art. 966(B)(2).
Here, SLE seeks review of the trial court’s granting of CHS’ motion for partial summary judgment finding that the 1968 Lease is valid and that CHS holds lessee *89 rights by assignment of the lease. SLE contends that the LLC is not bound by the terms of the 1968 Lease because there is no written assignment of the lease to CHS. Additionally, SLE claims that even if there was an assignment of the 1968 Lease, CHS acted in a manner that is “contrary to and inconsistent with its purported status as a 99-year lessee of the property.”
At the outset, we note that the 1968 Lease, by its terms, is valid on its face. Pursuant to La. C.C.P. art. 2662, a valid lease requires an agreement wherein “one party, the lessor, binds himself to give to the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay.” The 1968 Lease is valid under its terms as the lessor agrees to permit the lessee’s use and enjoyment of the subject property in exchange for the lessee’s promise to pay the rental price of $3,000.00 per year.
Assignment of the 1968 Lease
A lessee has the right to sublease or assign its rights in a lease, “unless [it is] expressly prohibited by the contract for lease.”[1] La. C.C. art. 2713. Further, under |flLa. C.C. art. 2681, a “lease may be made orally or in writing. A lease of an immovable is not effective against third persons until filed for recordation in the manner prescribed by legislation.”
The terms of the 1968 Lease do not prohibit its assignment. Therefore, we turn our attention to the chain of tenant assignments.
On August 1, 1968, CLL leased two nonadjacent parcels of land, Tracts E-2 and D-2, to Mississippi River Grain Elevator, Inc. (“MRGE”) for a 99-year term at $3,000.00 per year. MRGE, the original lessor, later changed its name to Feruzzi, U.S.A., Inc. (“Feruzzi”). In 1989, Feruzzi transferred its Myrtle Grove grain elevator assets to Mississippi River Grain, Inc. (“MRG”). However, SLE notes there is no evidence of a written assignment of the 1968 Lease from Feruzzi to MRG in 1989.[2] In August 1994, MRG sold the grain elevator operation and assigned its rights under the 1968 Lease to ConAgra, who subsequently assigned the 1968 Lease to CHS.
SLE’s contention, “seemingly based on the ‘Public Records Doctrine,’” is that it need not recognize CHS as the lessee to the 1968 Lease as the chain of tenant interest assignments was not recorded. SLE specifically asserts that the 1968 Lease is not expressly referenced in the Act of Sale or the later Act of Correction between Feruzzi and MRG, and thus, in *90 validates the later written | inassignment in 1994 from ConAgra to CHS. For that reason, SLE maintains that CHS failed to meet its burden of proving a valid assignment to establish its rights as lessee to the 1968 Lease.
SLE’s assertion hinges entirely on the LLC’s status as a third person to the 1968 Lease. Before addressing the LLC’s status as a third person, we recognize that “[l]eases are not required to be made or accepted in writing, nor are transfers of leases.” Grundmann v. Trocchiano, 127 So. 748, 749 (La.App. Orleans 1930). See also LaPorte v. Shirley, 00-1647, p. 2 (La.App. 4 Cir. 10/31/01), 798 So.2d 1234, 1236 (State law allows a lease to be either written or verbal under La. C.C. art. 2682). Therefore, “[w]hile it is acceptable that there need not be any particular statutory form for a valid assignment, there must, nevertheless, be evidence of such an assignment.” Producing Manager’s Co. Inc. v. Broadway Theater League of New Orleans, Inc., 288 So.2d 676, 679 (La.App. 4th Cir.1974). See also La. Mobile Imaging, Inc. v. Ralph L. Abraham, Jr., Inc., 44,600, p. 5 (La.App. 2 Cir. 10/14/09), 21 So.3d 1079, 1082 (An assignment is a valid transfer of rights and may be done orally (citing Meyer v. Ullo, 627 So.2d 226, 227 (La.App. 4th Cir.1993))).
Contrary to SLE’s claim, the trial court concluded that CHS presented sufficient evidence to establish that there was indeed a valid assignment from Feruzzi to MRG, in particular, the testimony of Timothy Paurus (“Mr. Paurus”), vice-president of terminal operations with CHS, and Edwin Blair (“Mr. Blair”), executive vice-president of CLL. Mr. Paurus testified to the series of transfers and that CHS has continuously owned the Myrtle Grove grain elevator and fleeted its barges in front of Tract E-2 since August 1994. Additionally, Mr. Blam testified that CLL and its predecessors leased Tract E-2 to all owner-operators of the Myrtle | n Grove grain elevator since 1968. He also testified that “[the 1968 Lease] was in effect between 1994 and 2007, and that CLL was CHS’ lessor as to Tract E-2.” Consequently, the 1968 Lease was valid in August 2007 when the LLC purchased Tract E-2.
After review of the evidence presented at trial, including witness testimony, we find no merit to SLE’s assertion that the non-recordation of the lease assignment between Feruzzi and MRG invalidates CHS’ rights under the 1968 Lease.
Third Party to Assignment
We next turn to SLE’s claim that the LLC was a third party to the assignment of the 1968 Lease. SLE avers that the 2007 Cash Sale does not mention “assignments,” nor do the terms of the Cash Sale “make [the] LLC a party to those purported assignments [or bind the LLC] to recognize CHS as a lessee under the 1968 Lease.”
SLE directs this Court to La. C.C. art. 3338, which provides that “the rights and obligations established or created by” an unrecorded lease assignment is without effect as to a third person. Under La. C.C. art. 3343, “a person who by contract assumes an obligation or is bound by contract to recognize a right is not a third party with respect to the obligation or right to the instrument creating or establishing it.”
The Cash Sale of Tract E-2 prepared by Mr. Lundin included the statement: “THE PARTIES TAKE COGNIZANCE THAT THE PROPERTY IS SUBJECT TO THE FOLLOWING.” What follows is a list of encumbrances on the property, including the 1968 Lease. At trial, Mr. Lundin testified that he added the foregoing statement to alert the parties that they were purchasing Tract E-2 [^“subject to” the *91 1968 Lease and other alienations and deficiencies in the property title.
Additionally, CHS’ expert witness, attorney Malcolm Meyer (“Mr. Meyer”), testified that “take cognizance” as referenced in the Cash Sale meant “that the parties recognized those items,” including the 1968 Lease. In light of the foregoing language contained within the 2007 Cash Sale of Tract E-2, we find the LLC “is a person personally bound by the 1968 Lease” as contemplated under La. C.C. art. 8343.
Ratification of Lease
Notwithstanding the above, even if the LLC was considered a third person with regard to the 1968 Lease, the LLC, through its actions, ratified the lease. Ratification, either express or tacit, “is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority.” La. C.C. art. 1843. In its reasons for judgment the trial court cited, Means v. Comcast, Inc., 44,504, p. 3 (La.App. 2 Cir. 8/19/09), 17 So.3d 1012, 1013-14, wherein the Second Circuit addressed the issue of ratification where a third party purchaser claimed he was not bound by the terms of the lease due to non-recordation. The Means court found because the third party purchaser knowingly accepted rent payments and other benefits of the lease, his actions constituted tacit ratification. Id., 44,504, p. 6,17 So.3d at 1015.
Similarly, the LLC in the present matter tacitly ratified the 1968 Lease. The language of the Cash Sale executed by the members of the LLC, SLE and CHS, indicates the purchase of Tract E-2 was “subject to” the lease. Additionally, witnesses for SLE and CHS testified at trial that CHS openly and continuously | lsoccupied and docked its barges adjacent to Tract E-2, without interruption, before and after the LLC acquired the property in August 2007.
SLE asserts that because CHS failed to pay rent on Tract E-2 between 2007 and 2011, the lapse in payments terminated the 1968 Lease. Nevertheless, CHS offered testimony that the lapse in payment was due to a “clerical oversight,” which CHS later cured. SLE also never demanded payment from CHS until after this lawsuit was filed.
Further, the LLC and SLE never disputed CHS’ lease rights, notified CHS it could not fleet its barges from Tract E-2, or tried to evict CHS from Tract E-2, until litigation in this case began. Thus, we find the evidence offered at trial supports this Court’s finding that the LLC’s actions ratified the 1968 Lease.
July 2007 Letter Agreement
SLE also claims that the July 2007 Letter Agreement terminated the 1968 Lease. SLE argues that because the Letter Agreement fails to “expressly assert its alleged lease rights ... CHS effectively waived and subordinated whatever lessee’s rights it may have had.” The trial court disagreed and found that the July 2007 Letter Agreement lacks any express language that indicates CHS “agreed to waive its rights under the 1968 Lease.” We agree.
The Letter Agreement states that “each party’s rights, duties and obligations with respect to [Tract E-2] will be set forth in the Mutual Fleeting Servitudes Agreement.” The MFSA acknowledges the 1968 Lease and CHS’ lessee rights, as it provides in pertinent part:
Whereas, CHS, as successor in interest to the Mississippi River Grain Elevator, Inc:, leases the property [Tract E-2] pursuant to a lease dated as of August 1, 1968, which represents approximately one thousand thirty-five (1035) linear feet along the Mississippi River.
*92 1 ^Furthermore, the MFSA was executed prior to the August 2007 Cash Sale, which specifically recognized the 1968 Lease.
In order for this Court to find the July 2007 Letter Agreement modified the 1968 Lease, we would have to ignore the longstanding rule that a subsequent authentic act “constitutes full proof of the agreement it contains, as against the parties.... ” La. C.C. art. 1885. In light of La. C.C. art. 1835, we disagree with SLE’s contention that the prior Letter Agreement varied the terms of the Cash Sale, a subsequent authentic act. As a result, we find the July 2007 Letter Agreement did not modify the 1968 Lease.
Doctrine of Confusion
Even assuming the 1968 Lease is valid, and CHS is a proper assignee, SLE makes the alternative argument that the 1968 Lease was terminated when CHS purchased Tract D-2 in 2009 from CLL, under the doctrine of confusion. “[W]hen the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion.” La. C.C. art. 1903. Additionally, “[f]or confusion to occur the same person must acquire the full and perfect ownership of both sides of the obligation by conveyance which is transla-tive of title.” Dept of Culture, Recreation & Tourism v. Fort Macomb Development Corp., 385 So.2d 1233, 1236 (La.App. 4th Cir.1980) (citing Langley v. Police Jury of Parish of Calcasieu, 201 So.2d 300, 305 (La.App. 3rd Cir.1967)); See also Comment, Extinguishment of Obligations by Confusion, 36 Tul. L.Rev., 521, at 531.
The 1968 Lease initially applied to Tracts E-2 and D-2. After the LLC purchased Tract E-2 from CLL in August 2007, CHS owed a lease obligation to thé LLC for Tract E-2 and a separate lease obligation to CLL for Tract D-2. From August 2007, until the time CHS purchased Tract D-2 in 2009, the qualities of | TSobIigee and obligor were not united in the same person with respect to either tracts of land. When CHS purchased Tract D-2 from CLL in 2009, CHS owed a lease obligation to itself for Tract D-2. As to Tract D-2 only, CHS’ lease obligation was extinguished by confusion. At that time, CHS still had a lease obligation to the LLC for Tract E-2.
SLE again points to the fact that CHS failure to pay rent for either tracts of land is further proof that CHS deemed the 1968 Lease abandoned under the doctrine of confusion. As previously discussed, CHS acknowledged its failure to pay rent, but it offered testimony at trial that the failure was due to a clerical error. Consequently, we reject SLE’s argument that the lapse in payments terminated the 1968 Lease.
It is clear from the record that the 1968 Lease document covered multiple obligations; however, that does not indicate only one lease obligation. CHS’ purchase of Tract D-2 did not terminate the 1968 Lease in its entirety because the purchase only transferred full and perfect ownership rights as to Tract D-2, not Tract E-2. We find no merit to SLE’s claim that under the doctrine of confusion CHS’ purchase of Tract D-2 extinguished the lease obligations to both tracts of land, and as a result, terminated the 1968 Lease.
Based on the foregoing, we find no genuine issues of material fact as to the validity of the 1968 Lease and CHS’ rights as lessee. Accordingly, we find no error in the trial court’s granting of CHS’ motion for summary judgment.

EXCEPTIONS

SLE also seeks review of the trial court’s granting of CHS’ exceptions of no right of action and no cause of action. Following the trial court’s granting of CHS’ motion for summary judgment, de- *93 daring the 1968 Lease valid, SLE filed a postjtrialie amendment to its petition. SLE sought distribution of Tract E-2 to SLE and CHS in indivisión as equal co-owners, dissolution of the LLC, and judicial partition in kind. CHS then filed exceptions of no right of action for partition and no cause of action for partition, both of which the trial court granted.
Exceptions of no right of action and no cause of action are questions of law; and therefore, this Court will review the trial court’s ruling under a de novo standard of review. Hornot v. Cardenas, 06-1341, p. 12 (La.App. 4 Cir. 10/3/07), 968 So.2d 789, 798. See also Badeaux v. Southwest Computer Bureau, Inc., 05-0612, 05-719, p. 7 (La.3/17/06), 929 So.2d 1211, 1217. In Homot, we noted:
The [Louisiana] Supreme Court [in Ba-deaux ] stated that “one of the primary differences between the exception of no right of action and no cause of action lies in the fact that the focus in an exception of no right of action is on whether the particular plaintiff has a right to bring the suit, while the focus in an exception of no cause of action is on whether the law provides a remedy against the particular defendant.” 05-0612, 05-719, p. 6, 929 So.2d at 1216-17.
The Supreme Court further explained that the function of an exception of no right of action is to determine whether a plaintiff is included in the class of persons to whom the law has granted the cause of action that is asserted in the plaintiffs petition. Id. The Supreme Court also discussed the function of an exception of no cause of action and stated that an exception of no cause of action “questions whether the law extends a remedy against the defendant to anyone under the factual allegations of the petition.” 05-0612, 05-719, p. 7, 929 So.2d at 1217. In considering the merits of an exception of no cause of action, the trial court is required to decide whether to grant or deny the exception on the basis of the face of the petition. Id. To resolve the issues raised by an exception of no cause of action, “each well-pleaded fact in the petition must be accepted as true.” Id. In the case of an exception of no right of action, however, evidence is admissible at a hearing on the exception to either support or rebut the exception. Eubanks v. Hoffman, 96-0629 (La.App. 4 Cir. 12/11/96), 685 So.2d 597, 600.
06-1341, p. 13-14, 968 So.2d at 798.
In its second amended petition, SLE requested “the immediate distribution of Tract E-2 to CHS and SLE in indivisión and as equal co-owners, the immediate 117dissolution of [the LLC], and the immediate judicial partition of the property in kind.” Opposing the petition, CHS argued that SLE has no right to demand partition of Tract E-2 because SLE is a member of the LLC with no ownership interest in the property. Likewise, CHS argued that SLE has no cause of action because the specific demands SLE enumerated in its second amended petition are prohibited by law and do not comply with the judicial guidelines for dissolution of a limited liability company.
According to La. R.S. 12:1329, “[a] membership interest [in a limited liability company] shall be an incorporeal movable. A member shall have no interest in limited liability company property.” For that reason, our jurisprudence recognizes that “individuals cannot assert property claims as members of an LLC where the disputed property interests are the property of the separate legal entity.” In re Cat Island Club, 11-1557, p. 8 (La.App. 3 Cir. 5/2/12), 94 So.3d 75, 80 (citing Van Meter v. Gutierrez, 04-0706, p. 7-8 (La.App. 4 Cir. 2/16/05), 897 So.2d 781, 786; and North *94 east Realty, LLC v. Misty Bayou, LLC, 40,573, p. 4 (La.App. 2 Cir. 1/25/06), 920 So.2d 938, 940-41). Moreover, La. C.C. art. 807 limits demands for partition of property to the co-owners of the property. We note La. C.C. art. 807 because its restrictions on who may demand partition of property to the property’s co-owners echoes the limitations on a limited liability company’s members’ interest under La. R.S. 12:1329 and the type of demand members may seek pursuant to La. R.S. 12:1326.[3]
| ,sIn this case, because the LLC owns Tract E-2 and SLE is only a member of the LLC, SLE has no ownership interest in the property. Therefore, SLE has no right to demand immediate partition of Tract E-2.
Likewise, SLE has no cause of action to request the distribution of the LLC’s property to SLE and CHS to be held in indivi-sión and immediately partitioned in kind. La. R.S. 12:1326 provides that in the absence of a written operating agreement stating otherwise, and regardless of a member’s contribution, a member “shall have no right to demand and receive any distribution from a limited liability company in any form other than cash.” (emphasis added). See also Cat Island, 11-1557, p. 8, 94 So.3d at 80.
On appeal, SLE contends that because the trial court granted the dissolution of the LLC, Cat Island “explicitly authorizes” distribution in kind. To support this contention, SLE points to the following discussion, where the Third Circuit noted:
... [WJhile the statutes prohibit a member from demanding that a distribution be in the form of property, see La. R.S. 12:1326, in post-dissolution proceedings, the statutes do not prohibit the liquidator from making a distribution in the form of movable or immovable property. See La. R.S. 12:1340(D).
Id. (emphasis added).
We disagree with SLE’s assertion that this excerpt authorizes demands for distribution in kind by members of an LLC. The Third Circuit merely recognized that in post-dissolution proceedings distribution in kind is possible.[4] However, in reaching that conclusion, the court was careful to make the distinction between the 119possibility of distribution in kind and the demand for it. The Third Circuit noted that even though the statutes do not prohibit distribution in the form of immovable property (suggesting that the liquidator or the court has the discretion to decide) that does not mean a member of a limited liability company may demand it. Therefore, we find Cat Island continues to uphold La. R.S. 12:1326 and prohibits members of an LLC to demand distribution in the form of immovable property.
*95 In addition, SLE’s request for distribution of the property does not comply with the judicial guidelines for the winding up the affairs of a dissolved limited liability company under La. R.S. 12:1336.[5] Louisiana law will only permit distribution of a dissolved limited liability company’s assets to members and former members “upon the winding up of the limited liability company,” “after paying all costs and expenses of the liquidation,” and making provision for payment of the LLC’s debts. La. R.S. 12:1337.
Here, SLE requested that the court wind up the affairs of the LLC by first distributing Tract E-2 in kind to SLE and CHS as co-owners and then partition in kind to CHS and SLE pursuant to La. R.S. 12:1337. Notably, SLE’s request ignores the required wind up procedures for dissolved limited liability companies before any distribution of cash or company assets are made, including publication | anof notice to the company’s creditors under La. R.S. 12:1338. Further, at the time SLE filed its second amended petition seeking distribution in kind, CHS had not yet exhausted its legal remedies on appellate review as to the trial court’s granting of judicial dissolution. Thus, SLE’s demand for partition was immature.
Accordingly, because SLE is not a co-owner of the LLC’s property (Tract E-2), holds no property interest in the LLC’s property, and is prohibited under Louisiana law from demanding that it become an immediate co-owner of the LLC property, SLE has no right to demand immediate distribution in kind and partition of the property. Based on our de novo review, we find no error in the trial court’s grant of CHS’ exceptions of no right of action and no cause of action.

DISSOLUTION

With regard to SLE’s main demand, the trial court granted dissolution of the LLC. The trial court held that it was not reasonably practical to carry on the business of the LLC. The trial court reasoned that CHS and SLE “reached an inability to work toward any goals or reasons for continued association with each other.”
The trial court’s finding that it is not reasonably practical for the parties to carry on business is a question of fact reviewable under the manifest error/clearly wrong standard of review. Warner v. Collins, 12-0773, p. 3 (La.App. 4 Cir. 12/12/12), 106 So.3d 693, 695; Dunbar Group, LLC v. Tignor, 267 Va. 361, 593 S.E.2d 216, 219 (2004) (The appellant argued that the evidence was insufficient to support judicial dissolution of the limited liability company. On appeal, the court *96 noted that because the lower court heard the evidence in the case, its ruling was entitled to the same heightened standard of review as a jury verdict. Therefore, the appellate court [2iWould not set aside the lower court’s ruling unless its findings were “plainly wrong or without evidence to support them.”).
La. R.S. 12:1334 states:
Except as provided in the articles of organization or a written operating agreement, a limited liability company is dissolved and its affairs shall be wound up upon the first to occur of the following:
(1) The occurrence of events specified in •writing in the articles of organization or operating agreement.
(2) The consent of its members in accordance with R.S. 12:1318.
(3) Repealed by Acts 1997, No. 717, § 2, eff. July 8,1997.
(4) Entry of a decree of judicial dissolution under R.S. 12:1335.
The record demonstrates that the LLC’s articles of organization do not specify the terms of dissolution, the LLC does not have an operating agreement, and CHS opposes the dissolution of the LLC. As a result, dissolution of the LLC must be by judicial dissolution under La. R.S. 12:1335, which states:
On application by or for a member, any court of competent jurisdiction may decree dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement.
In its reasons for judgment, the trial court noted that ‘reasonably practicable’ is not clearly defined by statute or by our jurisprudence, and consequently, it should be given its “general prevailing meaning.” See La. C.C. arts. 11 and 12. The trial court defined “practicable” as “capable of being put into practice or of being done or accomplished; feasible.”[6] Likewise, the trial court considered the statutes governing judicial dissolution of a corporation under the Louisiana Business Corporation Law. Dissolution of a corporation considers several factors, including the best interest of the shareholders, and various forms of deadlock. | Although the factors considered for dissolution of a limited liability company are not delineated, the trial court noted that the Louisiana Civil Law Treatise[7] suggests that several of the grounds for involuntary dissolution of a corporation could, also apply to the dissolution of a limited liability company.
In the present matter, the trial court determined that the members “did little to memorialize” the intended purpose of the LLC. The July 2007 Letter Agreement is the only document referencing the business purpose of the LLC. Additionally, the articles of organization provide only a general provision regarding the LLC’s purpose; namely, that:
The object and purpose [ ... ] shall be to engage in any lawful activity for which limited liability companies may be formed [ ... ] and to engage in any business enterprise which may be profitably conducted in conjunction with or incidental to said lawful activity.
Despite the lack of documentary evidence to indicate the original business purpose of the LLC’s formation, testimony at trial offered clarification.
*97 At trial, Mr. Stewart testified that SLE was formed to bring the ethanol plant into production. To do so, SLE needed to build a dock to service the ethanol plant. After SLE was unable to secure financing for the ethanol plant, Mr. Stewart testified that there was no longer a need for the dock. Mr. Stewart also indicated that SLE and CHS were not able to agree on the use for Tract E-2. When SLE declared bankruptcy, SLE attempted to sell its interest in Tract E-2 to a purchaser of its choosing. The bankruptcy court prevented SLE from doing so, however, as CHS opposed it, and the interest sale violated La. R.S. 12:1380. In addition, evidence at trial was presented that if the LLC was not dissolved, SLE would remain until it was able to liquidate the LLC’s assét, Tract E-2.
| ^Similarly, CHS offered the testimony of Mr. Anderson, CHS’ Vice-President. He testified that CHS partnered with SLE because SLE bought the LP & L Property, and CHS wanted to ensure its right to fleet its barges from the property. Mr. Anderson also testified that CHS would not have “given up” any part of Tract E-2 without receiving something in return. Moreover, Mr. Anderson testified that SLE never built a dock, and CHS has continued to use all of Tract E-2 to fleet its barges.
The trial court concluded that based on the evidence presented, the parties reached an impasse. Determining whether to grant judicial dissolution of the LLC, the trial court also relied on Cat Island.
In Cat Island, the Third Circuit considered whether the trial court’s decision to judicially dissolve a multi-member limited liability company was proper. Cat Island, 11-1557, p. 1, 94 So.3d at 76. The limited liability company was originally formed for the operation of a hunting camp. Id., 11-1557, p. 2, 94 So.3d at 76. After allegations surrounding the operation of the company and ownership interests of members, one of the members sought dissolution of the company. Id., 11-1557, p. 3, 94 So.3d at 77. The limited liability company’s articles of organization and the operating agreement failed to provide the terms for dissolution. Id., 11-1557, p. 5, 94 So.3d at 78. Also, because the Third Circuit found that there was no majority consent under La. R.S. 12:1318, there was no consent for the purposes of dissolution pursuant to La. R.S. 12:1334(2). Id., 11-1557, p. 6, 94 So.3d at 79. Nevertheless, the Third Circuit held that dissolution of the limited liability company was proper under La. R.S. 12:1334(4) upon entry of a decree of dissolution pursuant to La. R.S. 12:1335. Id.
124The Third Circuit’s decision does not provide a definition for “reasonably practicable” as it used in La. R.S. 12:1335; however, the court’s factual analysis and the similarities between Cat Island and the present matter offer guidance. The Cat Island court found that because there were “disputes over the Operating Agreement, the percentages of membership interests expressed in the Operating Agreement, and the manner in which [a former] member’s interest was acquired,” judicial dissolution was proper under La. R.S. 12:1335. Id., 11-1557, p. 4, 94 So.3d at 78.
More importantly, the Third Circuit found that competing interests regarding the use of the land owned by the limited liability company and the reason for which it was created led to the members’ “inability to work toward any goals or reasons for continued association with each other.” Id., 11-1557, p. 6-7, 94 So.3d at 79. As a result, the Third Circuit held that it was not reasonably practicable to carry on business among the members and that judicial dissolution of the limited liability *98 company was proper under La. R.S. 12:1335. Id., 11-1557, p. 7, 94 So.3d at 80.
In its answer to SLE’s appeal, CHS seeks reversal of the trial court’s grant of judicial dissolution. CHS avers that the trial court’s interpretation of “reasonably practicable” and its reliance on Cat Island is misplaced. Specifically, CHS claims that the trial court incorrectly interpreted Cat Island to disregard the requirements that “[ jthere be actual material decisions on which the members are deadlocked and [] the deadlock renders operation of the business no longer practical.” CHS also claims that aside from the dispute over the enforceability of the 1968 Lease and issues regarding the payment of taxes, as cited by the trial court, there are no actual management disputes.
lasCHS concedes that the validity of the 1968 Lease is a major dispute among the members. Nevertheless, CHS argues that the present litigation will resolve that dispute; and upon its resolution, no identifiable dispute will exist among the members of the LLC. We disagree.
The 'original purpose for forming the LLC in this case was to own Tract E-2 and permit its members, CHS and SLE, equal use of the property as contemplated in the MFSA. Ultimately, SLE was unsuccessful in bringing the ethanol plant into commercial production and filed for bankruptcy. Testimony at trial also established that CHS has continued, since 2007, to use all of Tract E-2 to the exclusion of SLE. Moreover, even in finding that the 1968 Lease was valid and binding on the LLC, the trial court did not rule, nor does the evidence suggest, that the purpose of the LLC was to lease all of Tract E-2 to CHS to the exclusion of SLE. Thus, the trial court concluded that the original purpose of the LLC, the mutual use and benefit of the property by its members, never came to pass.
The trial court also determined that, in addition to the foregoing, the parties “have seemingly never been able to cooperate to accomplish even the most mundane business” of the LLC. For instance, when SLE received the LLC’s bills for property taxes, it failed to pay. Only after CHS received the delinquency notice, CHS made arrangements to pay the taxes owed for the LLC. Further, when SLE filed a permit application to build a dock on the portion of Tract E-2 designated for SLE’s use, CHS opposed it. Mr. Anderson testified that CHS opposed the application because CHS believed SLE did not have a right to construct a dock on Tract E-2. Likewise, Mr. Anderson admitted that the parties dispute the use of Tract E-2.
12(jApplying the general prevailing meaning of “reasonably practicable,” and the guidance offered in Cat Island, the trial court determined that CHS and SLE are deadlocked as to the use of Tract E-2, the only asset and business purpose of the LLC, and as such, requires judicial dissolution. Based on the foregoing factual findings, we find the trial court did not err in granting SLE’s request for judicial dissolution.

DECREE

Based on our de novo review, we find no error in the trial court’s granting of CHS’ motion for partial summary judgment declaring the 1968 Lease valid and the trial court’s granting of CHS’ exceptions of no right of action and no cause of action. Furthermore, the trial court did not commit manifest error when it granted the judicial dissolution of the LLC. Accordingly, we affirm.
AFFIRMED.

. "The first sentence of this Article restates the principle of Article 2725 of the Civil Code of 1870." 2004 Revision Comment to La. C.C. art. 2713. In so far as this Court references La. C.C. art. 2713, we do so in limited scope as the official comments expressly state that the second sentence of the article, on which SLE relies to raise a new argument (See footnote 2), represents new law. Id. See also La. C.C. art. 6 ("In the absence of contrary legislative expression, substantive laws apply prospectively only.”).

. On appeal, SLE raises the new argument that there is no 1989 written assignment of the 1968 Lease between Feruzzi and MRG; and thus, the lease is not binding on the LLC because the 1968 Lease requires that any sublease must be in writing and delivered to the lessor as a condition of the sublease’s effectiveness. SLE asserts that the second sentence of La. C.C. art. 2713 extends the 1968 Lease provision to assignments. Given that SLE failed to raise this argument at the trial court level, we pretermit discussion of the issue. E. Capital Holdings, Ltd. v. Marsh & McLennan of Louisiana, Inc., 01-1852, p. 5 (La.App. 4 Cir. 4/3/02), 814 So.2d 759, 762 (Rule 1-3 of the Uniform Rules, Courts of Appeal provides that courts of appeal "will review only issues which were submitted to the trial court[... ] unless the interest of justice clearly requires otherwise.”).

. Distribution in Kind: Except as provided in a written operating agreement, a member, regardless of the nature of the member's contribution, shall have no right to demand and receive any distribution from a limited liability company in any form other than cash. No member shall be compelled to accept from a limited liability company a distribution of any asset in kind to the extent that the percentage of the asset distributed to the member exceeds the percentage in which the member shares in distributions from the limited liability company. La. R.S. 12:1326. (emphasis added).

. Under the “law of the circuit” rule, decisions from other circuits are not binding on this Court and are merely persuasive authority. Bridges v. Production Operators, Inc., 07-0648, p. 7 (La.App. 12/12/07), 974 So.2d 54; 59. See also Wilson v. A-1 Industries, Inc., 451 So.2d 1251, 1253 (La.App. 4th Cir.1984). Nevertheless, due to the lack of jurisprudence on the issues raised in this appeal and the similarities between the present matter and Cat Island, we find the case helpful to our analysis.

. La. R.S. 12:1336. A. Except as otherwise provided in the articles of organization or a written operating agreement, upon dissolution the members shall wind up the limited liability company’s affairs. The windup of the limited liability company’s affairs may be conducted by appointment of one or more liquidators to conduct the windup and liquidation. However, such appointment shall not be operative until both of the following occur:
(1) Notice of authorization of the dissolution, stating that the limited liability company is to be liquidated out of court and giving the name and post office address of each liquidator, has been published at least once in a newspaper of general circulation in the parish in which the limited liability company's registered office is located, and a copy of such notice, with the affidavit of the publisher of the newspaper to the fact of such publication attached, has been filed with the secretary of state.
(2) Articles of dissolution have been filed with the secretary of state in accordance with R.S. 12:1339.
B. However, any court of competent jurisdiction may wind up the limited liability company's affairs on application of any member or his legal representative or assignee or of any liquidator.

. The trial court cited Merriam-Webster Dictionary, Merriam-Webster, Inc. Safari 2013, as its source for the definition of "practicable.”

. 9 La. Civ. Law Treatise § 1.49.